UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEWEY TERRY, | Case No. 13-cv-01227-EMC |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| BRAD SMITH, et al., | |
| Defendants. | Docket Nos. 106, 107 |

## I.   INTRODUCTION

This *pro se* prisoner's civil rights action is now before the Court for consideration of two defense motions for summary judgment. For the reasons discussed below, the motions will be granted and judgment entered against Plaintiff.

## II.   BACKGROUND

A.   Procedural History

The amended complaint alleged that Defendants required Dewey Terry to clean and work in an area containing lead paint and asbestos in May and early June 2012. The amended complaint also alleged that defendants Philip Earley and Gary Loredo "fail[ed] to disclose/enter onto the Worker's Compensation forms exposure to Asbestos," and that failure "resulted in a 'fraudulent and/or Incomplete Worker's Compensation Claim.'" Docket No. 11 at 4.

This action was one of six actions which asserted claims based on the alleged asbestos and lead paint exposure during the cleaning of the mattress factory at San Quentin State Prison in May and early June 2012. The six related actions were *Dewey Terry v. Smith*, C 13-4102 EMC; *Markee Carter v. Smith*, No. C 13-4373 EMC; *Evert Spells v. Smith*, No. C 13-4102 EMC; *Norman Hirscher v. Smith*, 14-340 EMC; *Richard Arnold v. Smith*, No. C 13-4456 EMC; and *Lynn Beyett*

*v. Smith*, No. C 14-3153 EMC.  The six prisoner-plaintiffs appeared to be coordinating their

efforts, as their pleadings, requests, oppositions, and exhibits were similar.  On the other side, the

Defendants were being represented by the Law Office of Nancy E. Hudgins, except for Jeremy

Young, who was represented separately by attorney Kenneth Williams.  Defense motions for

summary judgment were filed in five of the six cases, although not in the *Arnold* case because that

proceeded at a slower pace.

The Court chose one case (*Carter*), went through the evidence in that case, and issued an

order granting in part and denying in part Defendants' motion for summary judgment.  The Court

then sent to the parties in all six cases the lengthy order in the *Carter* case, explaining that the

ruling in *Carter* was not technically dispositive of the motions for summary judgments in each of

the other related cases, but that the ruling showed the Court's evaluation of the evidence and

provided enough guidance for the parties in all the cases to have a good sense of their relative

positions for settlement purposes.  The Court then referred all the cases to a magistrate judge for

settlement proceedings.  Four of the actions settled, leaving this action and *Arnold v. Smith*, No.

13-cv-4456 EMC, remaining for adjudication.

B.     Statement of Facts

The following facts are undisputed unless otherwise noted.

The events and omissions giving rise to this action occurred in May and early June 2012

("the relevant time").  Mr. Terry presents evidence that the cleaning work began on May 9.

Docket No. 11 at 3.  The parties agree that the work stopped on June 6.  *Id.*; Docket No. 114 at 66-

67 (worker's compensation form signed by G. Loredo and P. Earley states: "From 5/29/2012 to

6/6/2012, inmate Terry was scraping, sanding, and powerwashing potential lead based paint off

the walls and windows of the mattress factory").

At the relevant time, Mr. Terry was a prisoner at San Quentin State Prison and worked in

the California Prison Industries Authority ("CALPIA") mattress and bedding factory at San

Quentin (the "mattress factory").  He was 52 years old.  Docket No. 11 at 38.  Defendants worked

for CALPIA.  Joe Dobie was the temporary supervisor of the mattress factory.  Philip Earley was

initially the factory manager of the mattress factory, and then was assigned temporarily to Folsom

2

State Prison.  Gary Loredo was the superintendent for several CALPIA factories, and also was the acting factory manager of the mattress factory while Mr. Earley was at Folsom.  Jeremiah Young was a supervisor at the mattress factory, but was reassigned to work in a different location during the relevant time.

　　　　1.　　The Cleaning of the Mattress Factory

In May to June each year, CALPIA factories throughout California cease production as they prepare to take annual inventory at the end of the fiscal year.  When the factories cease production, inmate-workers clean the work areas.  Cleaning operations in the mattress factory include removing the cotton dust from the walls, stripping the floor, and repainting the floor and the lines on the floor of the factory.  Every couple of years, the cleaning process also entails repainting the factory walls, which includes first removing the dust from the walls to be painted. *See* Docket No. 114 at 59.  Approximately 40 or 50 inmates were on the crew that cleaned the mattress factory in 2012. *See* Docket No. 1 at 37; Docket No. 11 at 20.

In May 2012, Mr. Griffin, the superintendent of the mattress factory, informed Mr. Earley that he intended to have the factory walls painted.  Mr. Earley approved the decision.  Mr. Griffin ordered paint and coordinated with Jeremy Young to have the walls painted in conjunction with the cleaning of the mattress factory.  Mr. Dobie assisted with the cleaning and painting preparations.  Docket No. 114 at 59-60.

On May 23, Mr. Earley appointed Mr. Dobie to oversee the mattress factory through inventory.  Docket No. 32-10 at 2; *see also* Docket No. 1 at 27.

On May 23 or 24, Mr. Dobie held a meeting with the inmates, and explained that they would be cleaning and painting the mattress factory for the next two weeks.  *See* Docket No. 11 at 41-42; *see also* Docket No. 1 at 27.  (Defendants present evidence that the event occurred on May 29.  Docket No. 32-10 at 2.)  Mr. Dobie explained that the plan was to remove the paint from the bottom section of windows and areas on the walls where paint was peeling and blistering, and that portions of the floor would be repainted.  He told the inmates to check out putty knives, scrapers and wire brushes from the tool room to remove paint from the windows and walls. Inmates also used a compressed air hose to remove cotton dust that had collected on the walls and surfaces

United States District Court
For the Northern District of California

1   around the mattress factory to prepare for painting.  Docket No. 32-10 at 2-3.

2       The parties disagree about the use of the power washer.  Mr. Terry presents evidence that

3   inmates using the power washer disturbed wrapping that was on the ceiling pipes.  Mr. Terry

4   states that the wrapping contained asbestos.  According to Mr. Terry, when the inmates washed

5   the ceiling and pipes, the pipe "insulation broke free upon contact with the hot water washer

6   disbursing both wet and dry particles throughout" the factory onto the inmates, including Mr.

7   Terry.  Docket No. 114 at 2.  The water from the power washer and the floor-stripping solvents

8   combined in "large pools on the floor," and mixed with the paint chips.  *Id.*  Inmates "waded

9   through" and "inhaled" the materials "for approximately ten days."  *Id.*

10      Mr. Terry presents evidence that indicates the power washing started no earlier than May

11  23.  *See* Docket No. 11 at 19 (Terry's inmate appeal states that Dobie was first assigned to

12  supervise on May 22, and that the inmates' exposure to hazardous materials started on May 24);

13  Docket No. 11 at 6 (Terry's complaint alleges that Dobie acquired the power washer on or about

14  May 25); Docket No. 33-1 at 9 (Terry's "affidavit of facts" stating that Dobie acquired power

15  washer on or about May 25).  Using May 23 as the starting date, and taking into account that May

16  28 was the Memorial Day holiday and Mr. Terry's statement that the inmates had a Monday-

17  Thursday work week, the power washing went on for eight days:  May 23 (Wednesday), May 24

18  (Thursday), May 29 (Tuesday), May 30 (Wednesday), May 31 (Thursday), June 4 (Monday), June

19  5 (Tuesday), and the morning of June 6 (Wednesday).

20      Defendants present evidence that the power washer was in use only for a couple of days, at

21  the most.  In a memo dated June 7, Jeremy Young (whose job title was "industrial supervisor,

22  mattress & bedding"), wrote that, on June 4, he received instructions from his "immediate

23  superior, Joe Dobie" to "pressure wash from ceiling to floor" and to cover the electrical boxes and

24  junctions so that no water would interfere with the electrical wires or connections.  Docket No. 59

25  at 5.  Mr. Young further stated in the memo that he "frequently checked in with [his] superior" –

26  apparently referring to Joe Dobie – "to make sure we were proceeding according to his plans.  Joe

27  Dobie stated multiple times throughout the day that I had to make sure that Inmates have N95

28  dus[t] mask[s] on.  He emphatically stated, in regards to the rationale for the dust masks; 'There

4

could be lead in the paint that they are scraping off of the walls and windows.'"  Docket No. 59 at 5.[1]  According to Mr. Young's memo, Mr. Dobie told him before the end of the day (on June 4) to continue with the same procedures the next day, i.e., scrape the paint off the walls and windows. *Id.*  That same memorandum noted that, on June 5, the inmates' "workload consisted of scraping, sanding, and pressure washing walls and floor." *Id.*  Mr. Young's memo did not mention asbestos. *See id.* at 5-6.

On the morning of June 6, Luu Rogers, who worked in the CALPIA maintenance division, walked through the mattress factory and observed that paint had been removed from the factory walls and windows, and that the ceiling had been pressure-washed, including the asbestos wrapping on the overhead steam pipes.  Docket No. 114 at 20.  Mr. Rogers contacted Mr. Loredo and advised him of the potential lead and asbestos hazard in the building.  Cleaning and painting operations were immediately halted on the morning of June 6.  Docket No. 114 at 20-24 (Mr. Rogers' June 6 and June 7 memos); Docket No. 32-1 at 3.

Photos of the factory show an open and airy workspace with a ceiling at least 12 feet high, and a limited number of pipes running near to the ceiling.  The pipes are covered with what appears to be insulation wrapped with tape, although there is no visible writing on the pipe covering.  The portions of the pipe covering that are disturbed are quite limited in number and the disturbed areas are quite confined in size.  For example, no disturbed area appears to be bigger than about six inches long. *See* Docket No. 90 at 21-28; Docket Nos. 90-1, 90-2, 90-3.[2]  The disturbances on any particular pipe appear few and far apart.

2.    Post-Shutdown Testing And Remediation At The Mattress Factory

CALPIA commissioned Earthshine Consulting, Inc., an environmental hazard company, to test for lead and asbestos.  On June 8, 2012, Earthshine collected samples from floor debris in four

---

[1] A manufacturer's brochure for an N95 mask states: "Do not use for gases and vapors, oil aerosols, asbestos, arsenic, cadmium, lead," and certain other substances.  Docket No. 59 at 52.

[2] According to Mr. Terry, the photos were taken during a site visit on November 2, 2015, Docket No. 90 at 20, and reflect the way the mattress factory appeared after the cleaning operation. Docket No. 107-2 at 8-9, 19.  Three photos have humans in them, which enables the viewer to have a sense of the size of the factory and damage to the pipes. *See* Docket No. 90-1 at 6; *see also* Docket No. 90 at 22, 23.

United States District Court
For the Northern District of California

locations in the factory to conduct a preliminary test for the presence of lead and asbestos. No asbestos was detected in those samples. Docket No. 32-1 at 3; Docket No. 32-2 at 1-4.

On June 27 or 29, 2012, Earthshine took additional samples from around the mattress factory. Docket No. 32-1 at 3-4; Docket No. 32-2 at 5-28. Those samples showed asbestos in the mastic adhesive under the floor tiles in the factory supervisors' office and trace amounts of asbestos in the glazing putty around the office windows, but it is undisputed that no inmates scraped paint in the office. Both materials were noted to be in "good" condition. Docket No. 32-1 at 3. Earthshine noted that the steam pipes along the factory ceiling were not tested but that the pipe wrapping was assumed to contain asbestos and was in "good" condition. *Id.* at 3-4. The report did not mention whether the pipe wrapping had been damaged by the pressure washer as claimed by Mr. Terry. The report listed the asbestos in the mastic adhesive and glazing putty as nonfriable, and listed the presumed asbestos in the pipe wrapping as friable. Docket No. 32-2 at 10. According to Defendants, the lead-detection samples taken showed that only the outside of the swing-out windows of the factory had elevated lead levels. *See* Docket No. 32-1 at 3. That, however, does not mean that there had not been lead paint elsewhere, as the workers had been scraping the paint for many days before the testing was done and the lead test results from the June 8 sampling of floor debris are not in the record.

The mattress factory was cleaned by Performance Abatement Services beginning on July 5, 2012. Following the cleaning and remediation, Performance Abatement Services confirmed that the factory passed standards for lead presence. The mattress factory resumed operations in Fall 2012. *See* Docket No. 32-2 at 30-32; Docket No. 32-9 at 4.

    3.    <u>Defendants' Awareness Of The Risks</u>

Mr. Terry presents evidence that prison officials generally were on notice of the presence of asbestos in the prison. He presents a CALPIA "worksite orientation" pamphlet for "new employee/CDCR staff/outside personnel" that had general workplace information, including this caution about asbestos: "Asbestos covered pipes are located throughout the PIA complex. DO NOT DISTURB these pipes. If you see a problem, notify a supervisor." Docket No. 114-1 at 10-11. The pamphlet is undated, but there are markings indicating that it was in use in 2006, *id.* at 10,

long before the relevant time in this action.  Mr. Terry also presents a copy of a "San Quentin Warden's Bulletin" regarding the "annual asbestos notification" that was directed to "all staff" and suggested there was asbestos-containing material somewhere in the prison; however, the bulletin is dated January 14, 2013, after the relevant time period.  Docket No. 59 at 28; Docket No. 114-1 at 9.

The parties disagree whether Mr. Dobie and Mr. Young knew of the presence of lead and asbestos in the mattress factory at the relevant time.  Mr. Terry presents a declaration made under penalty of perjury from inmate Lynn Beyett, that he (Mr. Beyett) alerted Mr. Dobie to the presence of lead paint and asbestos on May 23 or May 24:

> I went up to Joe Dobie and I said, "You do know all the paint on the windows and walls are "Lead Paint, and the pipes are wrapped in "Asbestos."??  He told me not to worry about it, he is running this shop & Lead Paint and Asbestos would not hurt anyone.  I said, "Mr. Dobie, I've been in the building trade for over Thirty (30) years, and we can't just scrap & chip or sand "Lead Paint", or power wash those pipes, as it will burst the Asbestos loose."
>
> I said, "There is Federal Laws that mandate we be trained and wear protective suits and have a breather at the very least.  Joe Dobie, then told me, "It's none of my business, I am the boss."  I then walked over to the maintenance shop to talk it over with our regular supervisor Mr. J. Young.  I told Mr. Young of the whole conversation I had with Joe Dobie, at which time Mr. Young said, "I know about it because I told Joe Dobie it's illegal and very wrong to make inmates work with no training on lead paint & asbestos removal, and no protective gear & Breather respirators.  I said, "Well what do we do?"  Mr. Young said, "Document everything or don't do it."  I said, He (Joe Dobie) told every one to either do what he says, or go home & refuse.  I can find replacements."  Mr. Young said, You have to do what Dobie says, or you will be fired most likely.  You know whatever Dobie says, it's the same as coming from the plant manager Phil Earley." . . .  Phil Earley had already told everyone, "You do what Dobie tells you to do.  It's the same as me telling you, because I have 600 men who want a job over in west block.  I will replace everyone of you if I have too."

Docket No. 114-1 at 15-16 (errors in source).

There is no evidence that Mr. Earley or Mr. Loredo actually knew of asbestos or lead paint in the mattress factory.  Mr. Terry presents evidence that they received training in many topics, but does not demonstrate that any of that training actually pertained to lead paint or asbestos detection.  Mr. Earley states:  "I was generally aware that some of San Quentin's facilities contained lead

United States District Court
For the Northern District of California

7

**United States District Court**
For the Northern District of California

paint or asbestos, but I never received training concerning identification of those materials nor where they were located." Docket No. 32-1 at 3. Mr. Loredo states that he was "aware that some of the steam pipes running along the walls and ceilings of the furniture factory were wrapped in asbestos material because the pipes were marked 'Asbestos.' But, I had no information concerning the presence of asbestos or lead paint in the mattress factory." Docket No. 32-3 at 2-3. Mr. Loredo also generally was aware that San Quentin executive staff issued notices regarding asbestos at the prison, but he never received specific information concerning its presence in the mattress factory. *See id*. at 3.

    4.    <u>The Testing Of Inmates And Preparation Of Workers' Compensation Forms</u>

After factory operations were halted on June 6, the inmates were tested for lead exposure. Mr. Terry's blood test came back with normal results. Docket No. 32-7 at 6. His June 8, 2012 blood test report lists a normal reference range of "0.0-10.0 mcg/dL" (i.e., micrograms per deciliter) for lead in the blood, and lists Mr. Terry as being within range with a lead level of less than 2.0 mcg/dL. *Id.*

No test to measure asbestos exposure was done on Mr. Terry, and there is no evidence that such a test exists for recent exposure to asbestos. *See* Docket No. 1-1 at 4 (September 13, 2012 memorandum to Mr. Terry from the California Correctional Health Care Services department denying his request for a test for asbestos exposure; "[u]nfortunately, there is no 'testing' available for asbestos exposure in your circumstance. In general, if there are any effects arising from asbestos exposure they are very slow to develop and may take decades to manifest to a degree to permit a test and diagnosis of the condition.")

A worker's compensation fund claim was submitted for Mr. Terry. *See* Docket No. 114 at 2, 66-67; Docket No. 11 at 33. On the portion of the form where the claimant is to state the "specific injury/illness and medical diagnosis if available," prison officials typed in "possible exposure to lead." Docket No. 114 at 66. The form was signed by Mr. Loredo as the employer representative. *Id.* at 67. Mr. Terry states that he did not fill out the form, although he does not dispute that he signed it. Docket No. 32-8 at 55-56 (Terry 7/24/14 Depo. Transcript). Mr. Terry's worker's compensation fund claim was rejected by the State Compensation Insurance Fund

because of a lack of medical evidence that Mr. Terry sustained any injury as a result of the possible lead exposure, but noted that he could inform the Fund if he developed any injury due to the exposure.  Docket No. 11 at 34.  The rejection letter notified the recipient of his right to disagree with the decision, and provided contact information "[if] you want further information on your rights to benefits or disagree with our decision."  *Id.*  There is no evidence that Mr. Terry took any further steps with regard to a worker's compensation claim.

Mr. Terry filed a claim with the California Victim Compensation and Government Claims Board.  That claim asserted a claim for lead and asbestos exposure, but did not mention any intentional concealment or fraud in the preparation of the worker's compensation claim form or any other problem with the preparation of the worker's compensation claim form.  *See* Docket No. 33-1 at 6-10.

5.   Medical Information

Mr. Terry attributes eye problems, breathing problems, chest pains and headaches to his exposure to asbestos.  Docket No. 11 at 3-4.  Mr. Terry has no medical training and offers no competent evidence to prove a causal connection between any of his current health issues and exposure to lead paint or asbestos.  *See* Docket No. 107-2 at 5.

Defendants present a declaration from a medical expert, Brad Piatt, M.D., who obtained his A.B. in biochemistry and completed post-graduate work in biochemistry at U.C. Berkeley, obtained his medical degree at Vanderbilt University, and now is a board-certified radiologist. Docket No. 107-3 at 1.  Dr. Piatt has "obtained substantial experience with asbestos and asbestos related medical illnesses during the analysis of diagnostic imaging for over a thousand patients being evaluated for asbestos exposure in order to determine the presence, type and extent of disease."  *Id.*  Dr. Piatt opines "to a reasonable medical certainty" that, "assuming Mr. Terry was exposed to asbestos as he has alleged, he has not and will not sustain any injury as a result."  *Id.* Dr. Piatt states that "[a]sbestos-related illness only develops after chronic, prolonged exposure to significant concentrations, most diseases occurring years or decades after substantial exposure." *Id.*at 3.  Because of the long latency period for asbestos-related illnesses, it is Dr. Piatt's "strong opinion that any symptoms described by Mr. Terry are not asbestos related as concurrent

symptoms are not associated with asbestos exposure." *Id.* at 5. Dr. Piatt also notes that several of Mr. Terry's symptoms have other potential causes based on information in Mr. Terry's medical records: Mr. Terry's eye problems may be related to pre-existing pterygium (i.e., an eye condition that itself can cause redness, inflammation, and vision impairment); his complaints of foot pain may be related to his pre-existing plantar fasciitis; and his respiratory complaints may be related to him having had pneumonia and a Legionnaire's Disease-related lung infection. *Id.* Dr. Piatt further states that "[n]o known link exists between asbestos and joint or bone pain," and that it is "nearly impossible to conceive that abdominal pain, headache, and/or nausea ever would be due to asbestos inhalation." *Id.* With regard to the claimed lead exposure, Dr. Piatt declares that, "[i]n adults, lead inhalation rarely results in medical disease unless there is prolonged exposure to high concentrations." *Id.* at 6. Mr. Terry's blood test showed the level of lead in his blood to be "medically insignificant." *Id.* In Dr. Piatt's medical opinion, "Mr. Terry has and will sustain no harm due to the lead or asbestos exposure he alleges." *Id.*

According to several government authorities, "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed to the fibers." 20 U.S.C. § 3601(a)(3) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980); *id.* at § 4011(a)(3) (Congressional statement of findings and purpose for the Asbestos School Hazard Abatement Act of 1984); "Asbestos NESHAP Adequately Wet Guidance," Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, EPA340/1-90-019 (1990) at 1 ("no safe concentration of airborne asbestos has ever been established"). "[E]xposure to asbestos fibers has been identified over a long period of time and by reputable medical and scientific evidence as significantly increasing the incidence of cancer and other severe or fatal diseases, such as asbestosis." 20 U.S.C. § 3601(a)(1) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980). Although making these findings about the general hazard of asbestos, Congress did not choose to close all potentially affected schools and instead directed that a task force be established, that States prepare plans, and that financial and other assistance be provided to States to address the problem. *See* 20 U.S.C.

United States District Court
For the Northern District of California

§ 3601(b).

The Occupational Safety and Health Administration ("OSHA") has regulations that do allow some asbestos exposure for workers.  One regulation sets a "permissible exposure limit" for employee exposure to asbestos.  *See* 29 C.F.R. § 1910.1001(c)(1) ("The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average"); *id.* at § 1910.1001(c)(2) ("The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes").

### III.   VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at San Quentin State Prison in Marin County, which is located within the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

### IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendant's challenge to the Eighth Amendment claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact.  The burden then shifts to the

nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine dispute of fact on each issue material to his affirmative defense.  *Id*. at 1537; *see also Anderson v. Liberty Lobby, Inc., 477 U.S.* at 248.  When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine dispute of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Mr. Terry's amended complaint (i.e., Docket No. 11) is made under penalty of perjury and is considered in opposition to the motion for summary judgment.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id*. at 631.

## V.   DISCUSSION

A.   Eighth Amendment Claim

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Deliberate indifference to an

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

inmate's health or safety may violate the Eighth Amendment's proscription against cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety.  *See Farmer*, 511 U.S. at 834.

       1.   <u>Asbestos</u>

          a.   <u>Objective Prong</u>

Exposure to toxic substances may be a sufficiently serious condition to establish the first prong of an Eighth Amendment claim, depending on the circumstances of such exposure, as explained by the Supreme Court in *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (inmate stated Eighth Amendment claim based upon possible future harm to health, as well as present harm, arising out of exposure to second-hand smoke).  The plaintiff "must show that he himself is being exposed to unreasonably high levels" of the toxic substance.  *Helling*, 509 U.S. at 35.  Moreover, determining whether the condition violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxic substance].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  *Helling*, 509 U.S. at 36.

Although *Helling* was a second-hand smoke case, the rule also applies to asbestos exposure.  In *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit cited *Helling* in a case in which an inmate had been exposed to asbestos during a prison cleaning operation.  The facts were much stronger for the plaintiff in *Wallis* than in Mr. Terry's case, as the *Wallis* plaintiff extensively handled asbestos-containing materials when he was on a work detail required to clean an attic with damaged asbestos-containing insulation on pipes and insulation material that "had broken loose and lay scattered around the attic" with other debris.  *Id.* at 1075.  Wearing inadequate masks, the inmates were required to "tear off loose pipe covering and insulation" and

**United States District Court**
For the Northern District of California

bag it for disposal in a dusty attic without outside ventilation.  *Id.*  The court in *Wallis* spent little time discussing whether the objective prong was satisfied for the Eighth Amendment claim because it was "uncontroverted that asbestos poses a serious risk to human health," and the plaintiff's medical expert had declared that the amount of exposure for that plaintiff was "medically serious," *id.* at 1076.

Other circuits also have cited *Helling* in cases involving toxic substances such as asbestos. *See, e.g., Templeton v. Anderson*, 607 F. App'x 784, 787 (10th Cir. 2015) (summary judgment proper for defendant because requiring inmate to work for one hour removing asbestos mastic and tiles "was not a significant duration given the type of exposure at issue" and therefore did not satisfy the objective prong of Eighth Amendment claim); *Smith v. Howell*, 570 F. App'x 762, 765 (10th Cir. 2014) (affirming summary judgment on qualified immunity grounds on Eighth Amendment claim because there were no Tenth Circuit or Supreme Court cases by 2003 that had held "that a limited exposure to asbestos dust for a few hours poses such an objectively serious risk of future harm to offend contemporary standards of decency.  Indeed there is no such authority even today."); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (there would be genuine issues of fact whether plaintiff was exposed to levels of asbestos sufficient to pose an unreasonable risk of damage to his future health based on his two-month stay in a facility "contaminated with asbestos to which inmates were routinely exposed," but summary judgment was proper because he alleged no physical injury and, pursuant to 42 U.S.C. § 1997e(e), he could not recover damages for mental and emotional stress without physical injury); *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) (Eighth Amendment claim properly dismissed because being housed in a cell for ten months near asbestos-covered pipes was not a serious enough condition; plaintiff "does not allege facts sufficient to establish that he was exposed to unreasonably high levels of asbestos.  Had, for example, [plaintiff] been forced to stay in a dormitory where friable asbestos filled the air, . . .we might agree that he states a claim under the Eighth Amendment. . . .  That, however, is not this case. . . . [T]he fact remains that asbestos abounds in many public buildings. Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual.")

United States District Court
For the Northern District of California

Mr. Terry fails to show a triable issue on the objective prong of his Eighth Amendment claim.  On the evidence in the record, no reasonable jury could find that Mr. Terry was "exposed to unreasonably high levels" of a toxic substance.  *Helling*, 509 U.S. at 35.  Mr. Terry's only evidence is that there was some unspecified amount of asbestos in the mattress factory and that a power washer in use for at most eight work days disturbed pipe covering presumed to contain asbestos.  As noted above, the disturbances to the pipe covering appear to be minimal.  And the samples from floor debris taken shortly after the shutdown contained no asbestos.  The only asbestos found was non-friable.  In contrast to *Wallis*, Mr. Terry fails to establish any evidence that he was exposed to unreasonably high levels of a toxic substance.  Indeed, Mr. Terry admitted in his deposition that he does not know if he was exposed to any particular quantity of asbestos.  That the air in the factory was dusty provides little information about the quantity of asbestos released because cotton dust was present before any disruption of the pipe covering:  the surfaces in the mattress factory had a cotton dust build-up that the workers were cleaning to get ready for painting.  There is no evidence the dust contained any asbestos, much less a dangerous amount of asbestos.

Mr. Terry appears at best to rely on a presumption that *any* exposure to asbestos is so grave that it violates the Eighth Amendment, but that sort of generalized presumption does not satisfy the standard set out in *Helling*.  Mr. Terry fails to present evidence that would allow the Court or a jury to do "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure" to asbestos, as contemplated by *Helling*, 509 U.S. at 36.  Without such evidence, neither the Court nor any reasonable jury could determine that the risk that Mr. Terry complains of is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Id.* Although there are Congressional findings that "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe," 20 U.S.C. § 3601(a)(3), those findings did not result in Congress deeming it necessary to shut down all schools because of the possibility of asbestos; instead, Congress provided time for studying, planning and funding efforts for asbestos remediation in schools.  Similarly, an OSHA regulation identified by Defendants

15

permits some small asbestos exposure, rather than forbids any and all exposure of workers to asbestos. *See* 29 C.F.R. § 1910.1001(c). The evidentiary void as to the science and statistics in Mr. Terry's case is fatal to his case.

In addition to failing to show exposure to any measurable level of asbestos, Mr. Terry also fails to establish a genuine issue for trial that he has suffered any current injury or has any likelihood of future injury as a result of his participation in the mattress factory clean-up. No medical expert declared that the amount of asbestos exposure for Mr. Terry (if any) was "medically serious," unlike in *Wallis*, 70 F.3d at 1076. Mr. Terry's assertion to the contrary cannot sustain his claim; he has no medical training, and offers nothing but speculation that his current ailments are causally related to the toxic substance exposure. In contrast to the dearth of evidence from Mr. Terry, Defendants present an undisputed medical expert declaration that (a) none of Mr. Terry's reported current ailments are causally related to his asbestos exposure, (b) asbestos-related diseases usually have a long latency period such that the diseases would not be expected to develop for many years, and (c) asbestos-related diseases usually require significant and prolonged exposure to asbestos. *Cf. Nguyen v. Biter*, 2015 WL 5232163, *6 (E.D. Cal. Sept. 8, 2015) (in prisoner action complaining that drinking water contained arsenic, defendants entitled to summary judgment on objective prong of Eighth Amendment claim because, although there was arsenic in the local drinking water, plaintiff provided no scientific evidence that the arsenic was present in sufficient amounts to cause the skin and other conditions he complained of, and there was no medical evidence that his conditions were specific to arsenic exposure).

At first blush, one might think today's determination that there is no triable issue on the objective prong is inconsistent with the Court's finding of a triable issue on the objective prong many months ago in the *Carter* case about the same mattress factory cleanup. The two decisions are not inconsistent for at least three reasons. First, there are now color photos in the record that literally and figuratively give a clearer picture of the situation.[3] *See* Docket No. 90 at 21-28;

---

[3] Photos had been submitted earlier in this case, but none were of a quality that allowed any insight into the scope of the incident. For example, Plaintiff submitted copies of photos of pieces of equipment found in the factory, but those allow no insight as to what the factory or pipes looked like. *See* Docket No. 1-1 at 35-45, Docket No. 11 at 54-61, and Docket No. 19 at 59-68. The

United States District Court
For the Northern District of California

Docket Nos. 90-1, 90-2, 90-3. The photos submitted by Mr. Terry plainly show that any asbestos release -- assuming (as the asbestos abatement company did) that the pipe covering had asbestos in it -- would have been extremely limited. The photos show an open factory environment, high ceilings, and a limited number of pipes near those ceilings, only some of which had any damage at all to the pipe wrapping. The damaged areas are quite confined and spaced far apart. *See* Docket No. 90 at 21-28, Docket Nos. 90-1, 90-2, and 90-3. Those photos plainly show that the situation at the mattress factory was dramatically different from the situation described in *Wallis*. Whereas in *Wallis*, the plaintiff directly and extensively handled asbestos in a closed and dusty attic, the release of asbestos here, if any, was incidental, isolated, and occurred in a large and open factory. Prior to submission of these color photos, the court was left guessing as to how much damage was done to an unknown number of pipes in an ill-defined environment. The photos now make clear that the situation was far different from the asbestos blizzard in *Wallis*. *Cf. Scott v. Harris*, 550 U.S. 372, 380-83 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") Second, defendants point out that an OSHA regulation sets limits on asbestos exposure and allows some small exposure to asbestos for workers. The regulation undermines any suggestions that each and every contact with asbestos fibers presents an unacceptable danger to human health. Since OSHA allows the free American work force to work in areas with some amount of asbestos fibers being present in the air and Congress essentially allowed children to remain in schools with asbestos being present, one cannot say that exposure of a prisoner to any amount of asbestos, no matter how small the amount, offends contemporary standards of decency. Mr. Terry's assertion to the contrary cannot be sustained. Third, Defendants now present a medical expert's declaration refuting any causal connection between the claimed asbestos exposure and Mr. Terry's present ailments and any risk of future asbestos-related illnesses. Mr. Terry presents no competent evidence to the contrary.

---

photos Mr. Terry provided that might be of the factory were too dark to be helpful. *See* Docket No. 40 at 8-9; Docket No. 52 at 61; Docket No. 53 at 56 (same photo as Docket No. 52 at 61).

United States District Court
For the Northern District of California

1    Viewing the evidence and inferences therefrom in the light most favorable to Mr. Terry, no

2    reasonable jury could find that he was exposed to an unacceptably high level of asbestos.  His

3    claim fails on the objective prong.

4                    b.    Subjective Prong

5            The plaintiff must show that prison officials acted with deliberate indifference to the risk to

6    his health or safety to establish the second prong of an Eighth Amendment claim.  Under the

7    deliberate indifference standard, the prison official must not only "be aware of facts from which

8    the inference could be drawn that a substantial risk of serious harm exists," but "must also draw

9    the inference."  *Farmer*, 511 U.S. at 837.  The prisoner "need not show that a prison official acted

10   or failed to act believing that harm would befall an inmate; it is enough that the official acted or

11   failed to act despite his knowledge of a substantial risk of serious harm."  *Id.* at 842.  "Whether a

12   prison official had the requisite knowledge of a substantial risk is a question of fact subject to

13   demonstration in the usual ways, including inference from circumstantial evidence, . . . and a

14   factfinder may conclude that a prison official knew of a substantial risk from the very fact that the

15   risk was obvious."  *Id.* (citation omitted).

16           Mr. Earley and Mr. Loredo prevail on the subjective prong (as well as the objective prong)

17   of the Eighth Amendment claim with regard to the asbestos exposure. For Mr. Earley and Mr.

18   Loredo, the only evidence regarding their knowledge is that they generally were aware that

19   asbestos existed at San Quentin, although they did not know the precise locations of the asbestos.

20   Mr. Loredo also knew some of the pipes in the *furniture* factory had asbestos wrapping, but did

21   not know whether the mattress factory pipes also had asbestos wrapping.  More importantly, there

22   is no evidence that Mr. Earley or Mr. Loredo knew that the mattress factory cleaning work would

23   include power washing the ceiling and pipes.  In light of the absence of evidence that these two

24   defendants knew that there was asbestos wrapping on the pipes and the absence of evidence that

25   these two defendants knew that the asbestos-wrapped pipes would be power washed and subject to

26   damage which allegedly released asbestos, no reasonable jury could conclude that these two

27   defendants acted with deliberate indifference to a serious risk to Mr. Terry's health.

28           The analysis for Mr. Dobie and Mr. Young on the objective prong is different, because Mr.

18

United States District Court
For the Northern District of California

1     Terry presents evidence that they actually knew of the asbestos in the mattress factory and

2     nonetheless required inmates to work in a manner that could and did disrupt that asbestos.  Mr.

3     Terry presents evidence that: (a) Mr. Dobie and Mr. Young were informed by inmate Beyett of

4     lead paint and asbestos in the mattress factory and specifically about the damage of power

5     washing asbestos-wrapped pipes two weeks before the work was stopped; (b) Mr. Dobie and Mr.

6     Young were aware that the power washer was being used floor to ceiling as it occurred, according

7     to Mr. Young's memorandum; (c) new employees were informed that asbestos-covered pipes were

8     located throughout the PIA complex and were instructed not to disturb those pipes; and (d) all

9     defendants knew there was at least some asbestos at San Quentin. *Cf. Wallis,* 70 F.3d at 1077 ("it

10    is not enough for the prison officials to claim they did not know about the asbestos in the attics.

11    The existence of the asbestos assessment report, the fire marshal's order to clean the debris off the

12    pipes, and the various prison officials' testimonies that they knew or suspected the existence of

13    exposed asbestos created an obligation for the defendants to inspect the attics prior to sending

14    work crews into them for forty-five hours – unprotected.")  However, there is no evidence that Mr.

15    Dobie and Mr. Young knew that the pipe covering would be severely and pervasively damaged in

16    a manner that would expose Mr. Terry and others to an unreasonable level of exposure to asbestos.

17    Indeed, the fact that there is no evidence of such exposure undercuts Mr. Terry's claim on the

18    subjective prong as to these defendants.

19         In any event, even if there were a triable issue as to Mr. Dobie and Mr. Young on the

20    subjective prong given the alleged warning by inmate Beyett,  Mr. Terry must raise a triable issue

21    on *both* the subjective and the objective prongs for his Eighth Amendment claim to survive

22    summary judgment.  As discussed in the preceding section, Mr. Terry does not show a triable

23    issue on the objective prong as to any defendant.

24         2.    Lead Paint

25         Mr. Terry fails to establish, or show a genuine issue for trial, that the lead paint to which he

26    was exposed presented a sufficiently serious condition to satisfy the first prong of an Eighth

27    Amendment claim.  He presents evidence that some of the paint in the mattress factory contained

28    lead, that he scraped and sanded paint during the mattress factory clean-up, and that the N95 mask

made available to him was not intended for use with lead.  However, the undisputed evidence is that his blood was tested for lead, and the blood test came back with a *normal* result.  No evidence was presented that the amount of lead in a person's blood will increase *after* the lead exposure is terminated; in other words, there is no evidence that a person who has normal levels of lead in his blood after his exposure to the lead ends will later have abnormally elevated levels of lead in his blood.  Given that the only objective measure of lead exposure came back showing normal results, no reasonable jury could conclude that the risk posed by the lead paint was "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36.

The causation requirement has been treated as part of the subjective prong of the Eighth Amendment analysis by the Ninth Circuit in *Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. 2006) ("This second prong – defendant's response to the need was deliberately indifferent – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference").[4]  However, causation "also comes into play as to the objective component" of a claim based on exposure to a toxic substance because the objective prong "allows a court to consider, among other things, a 'scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [a substance].'"  *Moore v. Faurquire*, 595 F. App'x 968, 973 n.6 (11th Cir. 2014).  For example, in *Moore*, the court found that a prisoner failed to raise a triable issue on the objective prong because he presented no evidence that applying paint stripper while wearing inadequate protective gear for one week created a substantial risk of serious harm: his "medical records contain no evidence that such a limited exposure to the paint stripper was capable of causing" the health problems he attributed to the exposure.  *Id.* at 973.  *See, e.g., Maus v. Murphy*, 29 F. App'x 365, 369 (7th Cir. 2002) (plaintiff "cannot prevail by demonstrating that the cell-front construction merely exposed him to a risk of harm; instead he must show that the project actually

---

[4] If there is an ongoing risk, the prisoner need not await until harm is caused to him before obtaining injunctive relief.  *See Farmer*, 511 U.S. at 845.  Here, there is not an ongoing problem from which the plaintiff seeks injunctive relief, but instead a past problem for which he seeks damages.  Mr. Terry no longer works in the mattress factory.

United States District Court
For the Northern District of California

caused him harm or was reasonably certain to cause him future serious injury," but plaintiff had failed to "present evidence connecting lung complications to any risks associate with exposure to lead paint"); *Mejia v. McCann*, 2010 WL 5149273, *8-*9 (N. D. Ill. 2010) ("existence of lead paint on walls does not state a viable constitutional claim," and there was no "competent evidence that lead paint in his cellhouse has caused [plaintiff] injury").

Mr. Terry fails to show a triable issue in support of his Eighth Amendment claim.  There *is* a test for lead exposure, and Mr. Terry had a normal test result.  A reasonable jury could not ignore that the blood test showed no harm to Mr. Terry when deciding whether Mr. Terry had raised a triable issue on the objective prong of his Eighth Amendment claim.  Given the limited duration of his exposure to lead and the normal blood test results, a reasonable jury could not find that he was exposed to a risk "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  *Helling*, 509 U.S. at 36.  Mr. Terry has not shown any expertise in the diagnosis of medical conditions and any claimed causal link between the lead exposure and any ailment he has is pure speculation in view of the normal blood test results.  *See, e.g.*, *Mejia v. McCann*, 2010 WL 5149273, *9-*10 (summary judgment granted for defendants on Eighth Amendment claim based on the regional problem of radium in the water because plaintiff did not show it caused plaintiff any harm, and his allegations that he suffered dry scalp and hair loss that he did not have before incarceration was not sufficient to send the matter to trial).  Mr. Terry's claim falters on the objective prong of his Eighth Amendment claim for lead exposure.

Mr. Terry's lead exposure claim also fails on the subjective prong.  As to Mr. Earley and Mr. Loredo, viewing the evidence in the light most favorable to Mr. Terry, no reasonable jury could find that those defendants were deliberately indifferent to any risk posed by lead paint.  Mr. Terry presents no competent evidence that Mr. Earley or Mr. Loredo was aware that there was lead paint in the factory or that either was aware that the inmates would be scraping lead paint in the factory cleaning operations.  The undisputed evidence is that these two defendants did not know of the lead paint, and without an awareness of the risk, they cannot be said to have been deliberately indifferent to any risk posed by it.  The lead paint claim would not fail on the subjective prong as to Mr. Dobie and Mr. Young because Mr. Terry presented evidence they were

informed by Mr. Beyett of the presence of lead paint.  Finally, if as *Jett* suggests, causation is part of the subjective prong of the Eighth Amendment analysis, Mr. Terry's claim fails against all Defendants because there is a complete absence of evidence that their actions or inactions with regard to the lead paint caused him any harm or risk of future injury.

In order to avoid summary judgment, Mr. Terry had to establish or show a triable issue of fact as to the existence of both prongs of his Eighth Amendment claims.  Viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr. Terry, all Defendants are entitled to judgment in their favor on his Eighth Amendment claim based on his alleged exposure to asbestos and lead.

B.   Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.  First, the court asks:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail.  *See id.*  If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . .  'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The existence of a triable issue as to whether a prison official was deliberately indifferent

**United States District Court**
For the Northern District of California

1    to an inmate's health or safety may require denial of a defense motion for summary judgment on

2    the merits of the Eighth Amendment claim, but the qualified immunity analysis does not end there.

3    *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002); *see id.* at 1049

4    ("*Saucier's* key point is that the qualified immunity inquiry is separate from the constitutional

5    inquiry").  "Even though the constitutional issue turns on the officers' state of mind (here,

6    deliberate indifference to a substantial risk of serious harm), courts must still consider whether –

7    assuming the facts in the injured party's favor – it would be clear to a reasonable officer that his

8    conduct was unlawful." *Estate of Ford*, 301 F.3d at 1045.  That is, the court must consider

9    whether the information available to the defendants made it so clear that the plaintiff would be

10   harmed that no reasonable officer could have allowed the situation to occur.  *Id.*

11         For an Eighth Amendment violation based on a condition of confinement (such as a safety

12   risk), the official must *subjectively* have a sufficiently culpable state of mind, i.e., "'the official

13   must both be aware of facts from which the inference could be drawn that a substantial risk of

14   serious harm exists, and he must also draw the inference.' . . .  Thus, a reasonable prison official

15   understanding that he cannot recklessly disregard a substantial risk of serious harm, could know

16   all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation

17   was not that high.  In these circumstances, he would be entitled to qualified immunity." *Estate of

18   Ford*, 301 F.3d at 1050 (quoting *Farmer v. Brennan*, 511 U.S. at 834, and citing *Saucier*, 533 U.S.

19   at 205).  Although the general rule of deliberate indifference had been expressed in *Farmer*, no

20   authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial

21   for Eighth Amendment purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at

22   834 n.3).  Because it had not been fleshed out, "it would not be clear to a reasonable prison official

23   when the risk of harm from double-celling psychiatric inmates with one another changes from

24   being *a* risk of *some* harm to a *substantial* risk of *serious* harm.  *Farmer* left that an open issue.

25   This necessarily informs 'the dispositive question' of whether it would be clear to reasonable

26   correctional officers that their conduct was unlawful in the circumstances that [they] confronted."

27   *Estate of Ford*, 301 F.3d at 1051 (emphasis in original).  Each of the defendants in *Ford* was

28   entitled to qualified immunity even though he was aware of some information that there was

23

*some* risk in double-celling the violent inmate with the decedent or any other inmate.

Just as qualified immunity was allowed in *Estate of Ford* because of the undefined qualitative elements, qualified immunity is appropriate here because of the undefined qualitative elements in *Helling*. *Cf. A.D. v. California Highway Patrol*, 712 F.3d 446, 455 n.4 (9th Cir. 2013) (denying qualified immunity for a substantive due process claim; "[t]he standard for a due process violation – purpose to harm unrelated to a legitimate law enforcement objective – does not contain undefined qualitative elements ("substantial risk" and "serious harm") like the Eighth Amendment standard does."). *Helling* stated that whether exposure to "unreasonably high levels" of a toxic substance violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxic substance].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.  This imprecise rule is the sort of rule that lower courts sometimes have to struggle with to determine its application to a given set of circumstances.

The cases mentioned earlier show that not all exposure to asbestos amounts to an objectively serious conduct, and that no court has articulated a well-defined test that a reasonable prison official could look to in order to determine the lawfulness of his actions.  On the one hand, *Wallis* found an Eighth Amendment violation for an inmate who directly handled already-damaged asbestos containing materials in a confined space for about 45 hours.  On the other hand, courts have rejected claims of Eighth Amendment violations from an inmate who worked for about an hour removing asbestos mastic and tiles (*Templeton v. Anderson)*, an inmate who was exposed to asbestos dust for a few hours (*Smith v. Howell*), and an inmate who was housed for ten months near asbestos-covered (but undisturbed) pipes (*McNeil v. Lane*).  The fact that lower courts have reached different results in determining whether exposure to a given toxic substance is an unreasonably high level so as to amount to an objectively sufficient serious condition highlights the difficulty that a reasonable prison official would have in determining whether his conduct was

United States District Court
For the Northern District of California

1  unlawful when inmates are exposed to or work with toxic substances.  The same problem exists

2  for lead paint – no court has articulated a well-defined test that a reasonable official could look to

3  in order to determine the lawfulness of his actions in allowing prisoners to deal with lead paint.

4       Defendants are entitled to qualified immunity against Mr. Terry's claims that they were

5  deliberately indifferent based on the asbestos and lead exposure because, as discussed above, the

6  facts in the record do not show the violation of a constitutional right by them.  *See Saucier*, 533

7  U.S. at 201 (defendants prevail on qualified immunity if there was no constitutional violation).

8  The undefined contours as to what amounts to "unreasonably high levels," *Helling*, 509 U.S. at 35,

9  of a toxic substance (such as asbestos or lead) to satisfy the objective prong of an Eighth

10  Amendment analysis also provides a second and independent basis for qualified immunity as to

11  Mr. Terry's claims.  Under the facts of this case, given the minimal, if any, exposure to lead and

12  asbestos in the mattress factory, the defendants could have believed reasonably and mistakenly

13  that the risk was not sufficiently substantial to violate the Eighth Amendment.  This is not a case

14  like *Wallis*, where there was prolonged and intense exposure to friable asbestos.

15  C.   <u>State Law Claims</u>

16       Mr. Terry contends that Mr. Earley and Mr. Loredo "attempted to minimize the severity of

17  the exposure by failing to disclose/enter onto the Workers' Compensation forms exposure to

18  asbestos."  Docket No. 11 at 4.  Mr. Terry believed at the relevant time that he had been exposed

19  to asbestos, yet he indisputably did not attempt to file a second workers' compensation claim to

20  add asbestos exposure to the list of alleged workplace injuries he suffered during the relevant time.

21       Defendants persuasively argue that any state law claims Mr. Terry is attempting to allege

22  in his amended complaint must be dismissed.  First, the workers' compensation scheme in

23  California Labor Code sections 3370 and 3601 is the exclusive remedy for injuries arising out of

24  the course and scope of employment.  *See* Cal. Lab. Code §§ 3600, 3602; *Cole v. Fair Oaks Fire*

25  *Protection Dist.*, 43 Cal. 3d 148, 155-57 (Cal. 1987); *see also Jimeno v. Mobil Oil Corp.*, 66 F.3d

26  1514, 1530 (9th Cir. 1995) ("we find that the California workers' compensation provisions

27  provide the exclusive remedy under California law for a work-related physical disability

28  discrimination claim").  The exclusive remedy provided by the California workers' compensation

1   scheme also precludes an action against another employee except in two circumstances not alleged

2   to be present here, i.e., intoxication or a "willful and unprovoked physical act of aggression of the

3   other employee."  Cal. Lab. Code § 3601(a)(1).

4          Second, insofar as Mr. Terry is alleging a claim of intentional concealment or fraud in the

5   preparation of the worker's compensation claim form that might not fall within the exclusive

6   remedy of the worker's compensation scheme, such a claim must be dismissed because Mr. Terry

7   indisputably failed to comply with the California Government Claims Act, which requires

8   presentation of the claim to the California Victim Compensation and Government Claims Board

9   ("Board").  *See* Cal. Gov't Code §§ 905.2, 911.2, 945.4, 950.2.  Mr. Terry had to present his

10  personal injury tort claim against a state employee or entity to the Board within six months of the

11  accrual of the cause of action, and had to present any claim relating to any other cause of action

12  within a year after the accrual of the cause of action.  *See* Cal. Gov't Code § 911.2.  Timely claim

13  presentation is "a condition precedent to plaintiff's maintaining an action against [a state employee

14  or entity] defendant."  *California v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1240 (Cal.

15  2004).  It is undisputed that Mr. Terry did not present a claim to the Board that mentioned any

16  intentional concealment or fraud in the preparation of the worker's compensation claim form.  The

17  claim that Mr. Terry did present asserted only lead and asbestos exposure claims, and did not

18  mention any misrepresentation or other problem with the preparation of the worker's

19  compensation claim form.  *See* Docket No. 33-1 at 6-10.  Therefore, any state law claim that is not

20  barred by the rule that the workers' compensation scheme is the exclusive remedy must be

21  dismissed because Mr. Terry did not comply with the claim-presentation requirement of the

22  California Government Claims Act.  The state law claims are dismissed.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

United States District Court
For the Northern District of California

# VI.   CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Jeremy Young is **GRANTED**, and the motion for summary judgment filed by Joe Dobie, Phillip Earley and Gary Loredo is **GRANTED**.  (Docket Nos. 106, 107.)  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  December 2, 2016

_____

EDWARD M. CHEN
United States District Judge